**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROZALYNN FISHER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TINTEDMD LLC,<br><br>Defendant. | C.A. No.:<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

OF COUNSEL:

Mark S. Reich*
Christopher V. DeVivo*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
mreich@zlk.com
cdevivo@zlk.com

**Pro hac vice forthcoming*

P. Bradford deLeeuw (DE Bar #3569)
**DELEEUW LAW LLC**
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
(302) 351-6905 (fax)
brad@deleeuwlaw.com

*Counsel for Plaintiffs*

Rozalynn Fisher ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint against Defendant TintedMD LLC ("TintedMD" or "Defendant"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this class action lawsuit on behalf of similarly situated individuals to address TintedMD's unauthorized disclosure of their private data, including their sensitive health information and personally identifiable information, to unauthorized third parties.

2. Defendant operates https://tintedmd.com (the "Website"), an online telehealth service through which visitors are evaluated by licensed healthcare providers for medical window tint exemptions and receive the doctor-signed medical documentation supporting a window tint exemption.[1] Medical window tint exemptions allow individuals with qualifying medical conditions, such as photosensitivity, lupus, or other conditions aggravated by exposure to sunlight, to seek authorization under applicable state law for vehicle window tinting that would otherwise exceed legal limits.[2]

3. Through the Website, users can obtain information about medical window tint exemptions, including qualifying medical conditions and state-specific requirements; read informational blogs, guides, and frequently asked questions concerning window tint exemptions; complete an online medical intake form through the "Check Your Eligibility" feature by

---

[1] *See* TINTEDMD, https://tintedmd.com/ (last visited Oct. 20, 2026).
[2] See, e.g., Cal. Veh. Code § 26708(b)(10), (e)(4).

providing information about their medical conditions; create and access patient accounts; obtain doctor-signed medical documentation supporting a window tint exemption.[3]

4. Defendant expressly represents that users' health information is protected: "TintedMD adheres to strict HIPAA security and privacy requirements. All medical records and personal health information are maintained within secure, HIPAA-compliant systems. Access to this information is strictly limited to you and the licensed healthcare professional involved in your evaluation. Your information is private, protected, and handled with the highest standards of confidentiality and security."[4]

5. However, embedded on the Website is tracking technology from third parties, including Meta, Microsoft, and TikTok (collectively, the "Tracking Entities," and their tracking technologies, the "Tracking Tools"). The Tracking Tools are designed to intercept users' communications with the Website and to disclose the contents of those communications to the Tracking Entities. Here, the Tracking Tools do so without users' knowledge or consent, and because of the nature of the Website, the intercepted communications include users' health-related browsing activity.

6. The Tracking Tools collect a broad range of sensitive user data, including detailed behavioral data and website interactions, such as search field inputs, questionnaire answers, and webpages viewed. This results in the capturing of users' health information, including light-sensitive medical conditions such as lupus, photophobia, albinism, and migraines, or any other condition that makes exposure to sunlight or glare unsafe or uncomfortable while driving. Furthermore, the Tracking Tools capture personal and persistent identifiers, including

---

[3] *See id.*
[4] *TintedMD HIPAA Privacy Policy & Telehealth Consent*, TINTEDMD, https://tintedmd.com/hipaa-compliance (last visited Oct. 20, 2026).

personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers, often contained within "cookies," that enable recognition of users across sessions and websites on the internet utilizing the same Tracking Tools; personal identifiers that associate users with individual profiles; and approximate geolocation information derived from IP addresses or similar signals (collectively, "Sensitive Information"). Each data point collected is aggregated by the Tracking Entities into comprehensive marketing profiles used to facilitate targeted advertising purchases by third-party advertisers seeking to reach specific users.

7. The Tracking Tools are active on the Website the moment a user arrives on the Website, capturing and transmitting to the Tracking Entities, users' Sensitive Information before: (i) users have encountered any terms of use or privacy policy; (ii) users have had any opportunity to consent; and, (iii) users have even become aware of Defendant's data handling practices. By the time a user might encounter a privacy policy or terms of use, the Tracking Entities have already captured a user's Sensitive Information.

8. Plaintiff is a user of the Website who had her Sensitive Information disclosed to the Tracking Entities without her consent.

9. Accordingly, Plaintiff has been harmed by Defendant's procurement of Tracking Entities to track and use Website users' Sensitive Information for marketing purposes, which constitutes unlawful wiretapping and an invasion of Plaintiff's privacy.

10. Plaintiff brings this action, and the claims set forth herein, on behalf of herself and a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Defendant is a citizen of the State of Delaware and of the state of its principal place of business in Wilmington, Delaware. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

12. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

13. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

14. Plaintiff Rozalynn Fisher is, and at all relevant times has been, a citizen of the State of California. Plaintiff accessed and used Defendant's Website while physically located in California. Plaintiff maintains accounts with Facebook. Her account contains her identifying information, and she was logged into those accounts when she accessed the Website.

15. Defendant TintedMD LLC is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. Defendant owns and operates the Website.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Experience On The Website

16. Plaintiff Fisher most recently visited the Website in or around July 2026, to check whether she qualified for a medical window tint exemption. During that visit, she browsed the Website's "About Us," "How it Works," and "Application" pages and clicked the "Qualify Now" feature to determine eligibility for a medical window tint exemption.

17. Plaintiff Fisher engaged with the Website's "Qualify Now" feature and provided sensitive health information concerning her medical conditions. Plaintiff Fisher disclosed that her skin reacts to sunlight and that she suffers severe sunburns. Plaintiff Fisher provided this information in connection with her effort to determine whether she qualified for a medical window tint exemption.

18. Plaintiff Fisher reasonably expected that her interactions with the Website, including her use of the "Qualify Now" feature and disclosure of information concerning her medical conditions and potential eligibility for a medical window tint exemption, would remain private and confidential, and would be used solely for the purposes for which she provided such information.

19. Plaintiff Fisher did not consent to the tracking, collection, or disclosure of her Sensitive Information to unauthorized third parties.

### II. How Websites Function

20. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

21. When a user navigates to a webpage, by entering a URL directly or clicking a hyperlink, that user's browser contacts a Domain Name System ("DNS") server, which translates the website's web address into a unique Internet Protocol ("IP") address.[5]

22. An IP address is "a unique address that identifies a device on the internet or a local network."[6]

23. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by that IP address (the "Request URL").

24. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

25. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

26. Website owners and web developers write and manage the URLs for their websites.

27. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. That code is

---

[5] *See How the Web Works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Oct. 20, 2026).

[6] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Oct. 20, 2026).

processed by the browser as it arrives[7] and rendered into the visual display according to the HTML's instructions, the visible, and usually interactive, website that most people think of.[8]

28. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[9] Such code is used, among other things, to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

29. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

## III. Defendant Programmed the Website To Identify and Track Users

30. Defendant voluntarily integrated Tracking Tools from the Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both the Defendant and the Tracking Entities.

---

[7] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the Page: How Browsers Work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work (last visited Oct. 20, 2026).

[8] *See What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 20, 2026).

[9] *See JavaScript: Adding Interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Oct. 20, 2026).

31. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for or even hover over.

32. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

33. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

34. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

35. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including

remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

36. The Tracking Entities use the collected Sensitive Information from users, such as Plaintiff, to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

37. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

**IV. Defendant's Website Uses Tracking Tools**

38. The Tracking Tools function by intercepting users' communications, including Plaintiff's Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, answer a question, or load any page on the Website.

39. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiff, when they visit the Website. The cookies allow the Tracking Entities to identify users, including Plaintiff, when they visit the Website or any other website where the Tracking Tools are present.

40. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiff's Sensitive Information. Defendant uses Plaintiff's Sensitive Information to improve their marketing and advertising, while the Tracking Entities use Plaintiff's Sensitive Information for marketing and advertising on the Website and other third-party websites, improve their own services, and to build personal profiles to advertise to users, including Plaintiff.

## V. The Meta Pixel

41. Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

42. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers.[10] A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[11]

43. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[12] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[13]

44. This Pixel ID must match a known Pixel ID in Meta's system, and is transmitted by the Meta Pixel.[14]

45. As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[15]

---

[10] *See Setup and Install the Meta Pixel*, META, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Oct. 20, 2026).
[11] *See id.*
[12] *See Get Started with the Meta Pixel*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Oct. 20, 2026).
[13] *See id.* ("To install the Pixel, we highly recommend that you add its base code . . .on every page where you will be tracking website visitor actions.").
[14] *See id.*
[15] *See id.* ("To install the Pixel, we highly recommend that you add its base code…on every page where you will be tracking website visitor actions.").

46. Defendant placed the Meta Pixel on the Website to gather, collect, and then transmit user information to Facebook.[16] Defendant and Facebook use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[17] Defendant directly benefits from the use of the Meta Pixel by using these profiles for advertising.

47. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[18]

48. Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

49. When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the "datr" cookie, and the "fr" cookie, are automatically created and stored on the user's device.[19] These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

---

[16] *See id.* The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and to share a tracked user's data with Facebook. *See Specifications for Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Oct. 20, 2026).

[17] *See Meta Pixel*, META (last updated Nov. 15, 2023), https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 19, 2026).

[18] *See Meta Advantage+ Audience: Target Ad Campaigns with AI*, META, https://www.facebook.com/business/ads/meta-advantage-plus/audience (last visited Oct. 20, 2026).

[19] *See Cookies Policy: What Are Cookies, and What Does This Policy Cover?*, META (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Oct. 19, 2026).

50. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

Cookie: sb=0r5TYP8LbS_cSfNNh1471Jbm; datr=075TYMp9Ab0I3w9zFNwy6r6X c_user=100091959850832;
usida=eyJ2ZXliOjEsImlkIjoiQXJ5b3lybzE4Z2J2ZHMiLCJ0aW1lIjoxNjkwODUwMDUwfQ%3D%3D;
xs=47%3AKkyLXdIOfDAkyA%3A2%3A1681934240%3A-1%3A-
1%3A%3AAcUntX_TAxYe59eQ67JyMIl77ylsQfvyB9RT5PMNDpM;
fr=0XA2ffNCTIX85IrMe.AWVODgSYpMci5QzcFCieZBGECZI.BkyWCe.87.AAA.0.0.BkyWCe.AWXInXTM4X4

*Figure 1 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

51. The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from Figure 1 to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook profile associated with the UID, as depicted below:




*Figure 2 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

52. The Meta Pixel tracks user activity on web pages by monitoring events,[20] which, when triggered, cause the Meta Pixel to automatically send data, users' Sensitive Information,

[20] *See About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Oct. 20, 2026).

directly to Facebook.[21] Examples of events utilized by websites include a user loading a page with a Meta Pixel installed (the "PageView event") and a user clicking a button on a page (the "SubscribedButtonClick" event) (collectively, the "Pixel Events").[22] The Website utilizes the Pixel Events.[23]

53. The Meta Pixel also transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "789243517284770" for the purpose of matching the harvested data to Defendant's Website.

54. Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook benefits from intercepting and analyzing users' Sensitive Information by refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms to target Meta's users, profiting from the ability to more accurately target potential customers.

55. Meta admits that it shares users' Sensitive Information with third parties,[24] just as Plaintiff's Sensitive Information was shared here.

56. Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below:

---

[21] *See id.*

[22] *See Specifications for Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Oct. 20, 2026).

[23] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About Meta Ads Data Advisor*, META, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Oct. 20, 2026).

[24] *See Privacy Policy*, META (July 23, 2026) https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Oct. 20, 2026).




*Figure 3 – Facebook Pixel tracking a user through the "PageView" event*




*Figure 4 – Contents intercepted by the Facebook Pixel when it captures a user's communications on the Website through the "PageView" event*




*Figure 5 – Cookies transmitted by the Facebook Pixel on the Website through the "PageView" event*




*Figure 6 – A sample user selecting the "severe sunburn even with brief exposure" option on the Website*




*Figure 7 – Facebook Pixel tracking a user through the "SubscribedButtonClick" event and capturing their selection of "severe sunburn even with brief exposure"*



*Figure 8 – Cookies transmitted by the Facebook Pixel on the Website through the "SubscribedButtonClick" event*



*Figure 9 – Facebook Pixel tracking user search communications on the Website*




*Figure 10 – Payload of Facebook Pixel tracking user search communications on the Website*




*Figure 11 – Cookies of Facebook Pixel tracking user search communications on the Website*

57. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[25] Plaintiff and Website users, however, are not provided this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Meta.

58. To make use of the Meta Pixel, Defendant agreed to Meta's Business Tool Terms (the "Meta Terms").

59. The Meta Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[26]

---

[25] *See Get Started with the Meta Pixel*, *supra* note 12. (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data…. By default, the Pixel will track URLs visited [and] domains visited.").

[26] *See Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Oct. 20, 2026).

60. The Meta Terms are transparent that Meta will use the Pixel Event information and contact information "to match the Contact Information against user IDs . . . , as well as to combine those user IDs with corresponding [Pixel Event information]."[27]

61. Meta directs parties implementing the Meta Pixel, here, Defendant, to encrypt request information[28] before data can be shared.[29]

62. Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

63. Meta educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[30]

64. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

---

[27] *Id.*
[28] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. *See id.*
[29] *See id.*
[30] *See Privacy and Data Use Requirements for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Oct. 20, 2026).

## VI. Microsoft UET

65. Microsoft offers Microsoft Advertising (formerly known as "Bing Ads"), a platform where advertisers can display ads to consumers across the internet based on their search terms and interests.[31]

66. One of the software tools available through Microsoft Advertising is Universal Event Tracking ("UET"), which allows website owners, like Defendant, to allow Microsoft to track conversion events on a website, target specific audiences, and automate advertisement bidding.[32] Defendant uses the information collected by UET to maximize the performance of the advertising on the Website.[33]

67. UET is a tag that is placed on a website. Once UET is installed, the tag reports all users' activity on the website to Microsoft Advertising.[34]

68. UET uses several cookies, which it stores and/or accesses on website visitors' browsers. These cookies include the MR cookie, the MUID cookie, which contains a globally unique ID assigned to a visitor's browser that identifies them,[35] the _uetsid cookie, which contains a session ID, and the _uetvid cookie, which contains a unique ID for a unique website visitor.[36]

---

[31] *See Bing Ads API Overview*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/?view=bingads-13 (last visited Oct. 20, 2026).

[32] *What Is UET and How Can It Help Me?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/56681/2 (last visited Oct. 20, 2026).

[33] *See id.*

[34] *See id.*

[35] *See Cookies*, MICROSOFT, https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-cookies (last visited Oct. 20, 2026).

[36] *See FAQ: Universal Event Tracking*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Oct. 20, 2026).

69. UET can collect a vast amount of data from website visitors. The MUID/GUID cookie and the visitor's IP address are always passed to Microsoft with every HTTP request from UET. UET can also collect:

- Event actions
- Event categories
- Event types
- Browser language setting
- Page URLs
- Referrer URLs
- Screen height
- Session ID
- The UET tag ID
- A signed-in user's ID
- A visitor ID[37]

70. Information collected by Microsoft UET is used to build custom audiences. Audiences are created by segmenting users by personal characteristics and interests. Advertisers like the Defendant then use these groups to improve and target their advertising.[38]

71. These audiences can be shared between advertisers that use Microsoft UET, allowing advertisers to track users between websites across the internet.[39]

---

[37] *See id.*
[38] *See Universal Event Tracking*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking?view=bingads-13 (last visited Oct. 20, 2026).
[39] *See id.*

72. Microsoft uses the data collected by Microsoft UET for its own purposes. Microsoft claims ownership over all information collected by their customers and uses it to deliver Microsoft Advertising and improve its own services.[40]

73. Defendant's use of UET on the Website is shown in the figures below:




*Figure 12 – UET tracking users' communications on the Website*

40 *See Microsoft Advertising Agreement*, MICROSOFT, https://help.ads.microsoft.com/Resources/Microsoft_Advertising_Agreement_Online_Terms_v.2026-09-01/en-us.pdf (last visited Oct. 20, 2026).




*Figure 13 – Content intercepted by UET tracking users' communications on the Website*




*Figure 14 – Cookies transmitted by UET on the Website*




*Figure 15 – UET tracking user search communications on the Website*




*Figure 16 – Content intercepted by UET tracking user search communications on the Website*




*Figure 17 – Cookies transmitted by UET on the Website when tracking user search communications*

## VII. The TikTok Pixel

74. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

75. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website. To use the TikTok Pixel, the website operators, including Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[41]

76. Defendant's TikTok Pixel ID is DA6SATRC77U6VIRE2030 and is included in transmissions sent to and from users' devices.

---

41 *See generally Troubleshoot with Pixel Helper*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Oct. 20, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

77. TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[42]

78. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

79. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of a user);

c. Device information, including make, model, operating system, and browser information;

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[43]

80. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

81. TikTok's "Advanced Matching" feature allows Defendant to "match customer information such as email, phone number, and other identifiers with actions people take on [the

---

[42] *See generally About TikTok Pixel*, TIKTOK (last updated June 2026) https://ads.tiktok.com/resources/help/article/tiktok-pixel?lang=en (last visited Oct. 21, 2026); *Troubleshoot with Pixel Helper*, TIKTOK (last updated Feb. 2025) https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Oct. 21, 2026).

[43] *See About TikTok Pixel*, *supra* note 4242.

Website]."[44] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[45] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[46] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[47]

82. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about millions of TikTok users to identify users and develop their marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[48]

83. Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users loaded webpages, made searches, and filled out forms on the Website.

84. The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users[49]).

---

[44] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 20, 2026).

[45] *How to Set Up Automatic Advanced Matching*, TIKTOK (last updated Nov. 2025) https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Oct. 20, 2026).

[46] *See Get Started With The TikTok Pixel: A Small Business Guide*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Oct. 20, 2026) (benefits of using the TikTok Pixel).

[47] *See* Lizzie Davey, *How to Use TikTok Pixel: TikTok Conversions Tracking*, LEADSBRIDGE (May 2, 2025) https://leadsbridge.com/blog/tiktok-pixel/ (last visited Oct. 20, 2026).

[48] *See id.*

[49] *See List of Cookies*, G-STAR RAW 13 (March 2023) https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Oct. 20, 2026).

85. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[50]

86. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising, and to generate its own benchmarking reports to share with other TikTok business customers.[51]

87. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third parties,[52] just as Plaintiff's Sensitive Information was gathered and shared here.

88. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately link[s] to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[53] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "often before users have a chance to accept cookies or otherwise grant consent."[54]

89. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

---

[50] *See Get Started with the TikTok Pixel: A Small Business Guide*, *supra* note 4646.
[51] *See TikTok Business Products (Data) Terms*, TIKTOK (Jan. 22, 2026) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Oct. 20, 2026).
[52] *See Privacy Policy*, TIKTOK (July 15, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Oct. 20, 2026).
[53] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023, 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Oct. 20, 2026).
[54] *Id.*




*Figure 18 – Using a browser's "developer tools" while visiting Defendant's webpage confirms the Website loading TikTok Pixel's code onto the user's browser, which caused the transmission of an HTTP Request to TikTok's servers*




*Figure 19 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including Advanced Matching and AutoAdvancedMatching*

90. The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show TikTok capturing users' communications on the Website:




*Figure 20 – TikTok Pixel capturing a user's communications on the Website*




*Figure 21 – Contents intercepted by the TikTok Pixel when it captures a user's communications on the Website*




*Figure 22 – Cookies transmitted by the TikTok Pixel to and from the Website through the "Pageview" event*




*Figure 23 – TikTok Pixel tracking user search communications on the Website*




*Figure 24 – Contents intercepted by the TikTok Pixel when it captures user search communications on the Website*



*Figure 25 – Cookies transmitted by the TikTok Pixel to and from the Website when capturing user search communications*



*Figure 26 – Contents intercepted by the TikTok act event when it captures a user selecting the "Severe sunburn even with brief exposure" option on the Website*




*Figure 27 – Cookies transmitted by the TikTok act to and from the Website when capturing user search communications*

91. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiff and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiff and Website visitors.

92. The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[55]

93. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[56]

94. TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent

[55] *See TikTok Business Products (Data) Terms*, *supra* note 5151.
[56] *See id.*

and lawful."[57] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

95. TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[58]

96. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their Sensitive Information.

## VIII. The Tracking Tools Intercepted and Disclosed Both the Contents of Plaintiff's Communications With the Website, As Well as Her Personal Identifiers.

97. When Plaintiff used Defendant's Website, including its "Qualify Now" questionnaire, she communicated information about her medical conditions, physical limitations, and eligibility for a medical window tint exemption. The Tracking Tools transmitted this information to the Tracking Entities in two ways: through the URLs of the questionnaire pages Plaintiff visited, and through Plaintiff's questionnaire answers themselves.

98. The URLs transmitted to the Tracking Entities were not mere addresses. Because each questionnaire page corresponds to a specific question or response, the URL itself revealed the substance of Plaintiff's communications. Coupled with Plaintiff's questionnaire answers, the URLs conveyed the contents of her communications with Defendant: what she asked, what she disclosed about her health, and what service she sought.

---

[57] *Id.*
[58] *Id.*

99. Each transmission also included unique ID Cookies that identified Plaintiff individually.

100. These transmissions occurred in real time. When Plaintiff submitted information on the Website, the Tracking Tools caused her browser to simultaneously send a duplicate of that communication to the Tracking Entities, which read or attempted to learn its contents while it was in transit.

101. Plaintiff Did Not Consent to Defendant's Sharing of Her Website Activity

102. Plaintiff was never presented with or asked to agree to the Website's Privacy Policy.

103. Given the sensitive nature of the information involved, Plaintiff reasonably expected that her communications with the Website were confidential and would not be disclosed to the Tracking Entities.

104. Defendant did not adequately disclose its use of the Tracking Tools on the Website. Plaintiff therefore did not, and could not, consent to the interception and disclosure of her Sensitive Information.

105. This matters because Plaintiff's and the Class members' Sensitive Information has concrete economic value.[59]

---

[59] *See* Order Denying Google's Mot. for Summ. J. at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb Lets You Sell Your Data to AI Labs for Training*, AXIOS (Aug. 6, 2026) https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New Wallet App Lets Users Store Their Own Training Data*, AXIOS (Sept. 22, 2025) https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (similar) (last visited October 20, 2026.).

106. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[60]

107. By facilitating the Tracking Entities' interception, collection, and transmittal of Plaintiff's Sensitive Information to the Tracking Entities, Defendant took for itself and the Tracking Entities the value of that information without consent or compensation. Defendant also stripped Plaintiff of the ability to decide whether, when, to whom, and on what terms her Sensitive Information would be shared and/or sold.

108. Because Defendant and the Tracking Entities have already obtained Plaintiff's information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiff.

## IX. Federal Law Recognizes the Sensitivity of the Information Defendant Disclosed

109. Information about a person's physical and mental health is among the most sensitive information there is. Its disclosure can lead to discrimination, stigma, and denial of insurance coverage. The risk of disclosure also deters people from seeking care.

110. Federal law reflects this. Under HIPAA and its implementing Privacy Rule, a covered entity may not use or disclose protected health information ("PHI") except as the Rule permits. It also may not use or disclose PHI for marketing without the individual's written authorization. *See* 45 C.F.R. §§ 164.502(a), 164.508(a)(3).

111. Plaintiff does not assert a claim under HIPAA. However, HIPAA's standards are relevant because they confirm the private nature of the Sensitive Information and inform the reasonable expectations of Defendant's Website users.

[60] *5959.*

112. PHI is not limited to diagnoses or medical records. According to HHS, identifying information becomes PHI when it is linked to health care.

113. Plaintiff's Sensitive Information includes identifiers that link each Website visitor's health-related communications to that specific visitor.

114. HHS and the FTC have applied these principles to tracking technologies specifically. In July 2023, they jointly warned approximately 130 hospital systems and telehealth providers that tools such as the Meta Pixel can disclose sensitive health information to third parties in ways largely unknown to users.[61]

115. Defendant knowingly disclosed the Sensitive Information to the Tracking Entities for its own commercial advantage.

## TOLLING

116. The statutes of limitations applicable to Plaintiff's and Class members' claims are tolled by Defendant's conduct and Plaintiff's and Class members' delayed discovery of their claims.

117. As alleged above, Plaintiff and Class members did not know and could not have known when they used the Website, Defendant was disclosing their Sensitive Information to the Tracking Entities without their consent. Plaintiff and members of the Class could not have discovered Defendant's unlawful conduct with reasonable diligence, given the highly technical nature of how the Tracking Tools operate.

---

[61] *See FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FEDERAL TRADE COMMISSION (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery (last visited Oct. 20, 2026).

118. Defendant had exclusive and superior knowledge that the Tracking Tools incorporated on its Website would disclose Plaintiff's and Class Members' Sensitive Information to the Tracking Entities.

119. The earliest Plaintiff and Class Members could have known about Defendant's conduct in connection with their investigation and the work done on their behalf in preparation for filing this Complaint, on or about October 16, 2026.

## CLASS ALLEGATIONS

120. Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class and the California Subclass.

121. Plaintiff brings this class action individually and on behalf of the following Class:

> All persons in the United States who, during the Class Period, submitted information through and/or accessed pages on Defendant's Website while the Tracking Tools were installed on those pages (the "Class").

122. Plaintiff brings this class action individually and on behalf of the following California Subclass:

> All members of the Class who did so while located in California (the "California Subclass").

123. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

124. Plaintiff reserves the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

125. NUMEROSITY: At this time, Plaintiff does not know the number of Class members but believes the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

126. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether Defendant has been unjustly enriched by its conduct; and

e. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties.

127. Common questions of fact and law exist as to all California Subclass members and predominate over any questions affecting only individual members of the California Subclass. Such common legal and factual questions, which do not vary between the California Subclass members, and which may be determined without reference to the individual circumstances of any California Subclass member, include but are not limited to the following:

a. Whether Defendant's conduct constitutes a violation of the CIPA; and

b. Whether Defendant's conduct constitutes a violation of the California Constitution.

128. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant without consent, Plaintiff is asserting claims that are typical of the Class members.

129. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

130. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiff and the Class)

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

132. Plaintiff brings this cause of action on behalf of herself and all Class members.

133. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

134. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

135. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

136. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

137. The Wiretap Act defines "person" to include "any individual, partnership, association, . . . trust, or corporation." 18 U.S.C. § 2510(6).

138. Plaintiff, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

139. The Tracking Tools, Plaintiff's devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

140. Plaintiff had a reasonable expectation of privacy in her electronic communications with Defendant's Website, including the pages she viewed, health questions she answered via the Website, health-related browsing activity, and other interactions with Website features.

141. During the relevant time period, the Tracking Tools intercepted the contents of Plaintiff's electronic communications with the Website while those communications were in transit and transmitted them to the Tracking Entities, all without Plaintiff's consent. The Tracking Entities intercepted these communications to monetize them, including by combining them with information the same Tracking Tools collected about Plaintiff across the Internet and using the combined data for advertising, analytics, and marketing optimization.

142. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

143. Plaintiff was never asked to consent to the interception, recording, disclosure, or use of her electronic communications, including her Sensitive Information.

144. Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, disclosing Plaintiff's health information, and associating the content of Plaintiff's and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiff and the Class members on its Website.

145. Defendant intentionally used the wire or electronic communications to increase its profit margins and for financial gain.

146. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; and

c. a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT II**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

147. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

148. Plaintiff brings this cause of action on behalf of herself and all California Subclass members.

149. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or

permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

150. The Website, the Tracking Tools, and Plaintiff's devices and browsers each qualify as a "machine, instrument, or contrivance, or . . . other manner" used to engage in the prohibited conduct at issue. *See* Cal. Penal Code § 631(a).

151. Within the relevant time period, the Tracking Entities, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

152. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

153. As a direct and proximate result of Defendant's conduct, Plaintiff and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631. *See* Cal. Penal Code § 637.2.

**COUNT III**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiff and the California Subclass)**

154. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

155. Plaintiff brings this cause of action on behalf of herself and all California Subclass members.

156. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

157. Plaintiff and the California Subclass members have a legally protected interest in their Sensitive Information, including their sensitive health information.

158. Plaintiff and California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of personal information."[62]

159. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information, is and would be highly offensive to a reasonable person.

160. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff and the California Subclass members have been harmed and are entitled to compensatory and punitive relief.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

161. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

---

[62] Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, at 27.

162. Plaintiff brings this cause of action on behalf of herself and all Class members.

163. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and the Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

164. It is unjust that Defendant retains those benefits under circumstances in which the Sensitive Information was collected and transmitted without valid consent.

165. Plaintiff and the Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant.

166. There is no remedy at law that will address this harm, as monetary damages will not capture or account for the wrongful profit or benefit that Defendant received from exploiting Plaintiff's and Class Members' Sensitive Information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order determining that this action is properly brought as a class action, certifying the Class and the California Subclass, and certifying Plaintiff as the representative of the Class and the California Subclass and her counsel as Class Counsel;

b. For an order finding in favor of Plaintiff, the Class and the California Subclass, on all counts asserted herein;

c. An award of statutory damages or penalties to the extent available;

d. An award of punitive damages to the extent available;

e. For damages in amounts to be determined by the Court and/or jury;

f. For pre-judgment interest on all amounts awarded;

g. For an order of restitution and all other forms of monetary relief;

h. An award of all reasonable attorneys' fees and costs; and

i. Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable.

Dated: October 21, 2026

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (DE Bar #3569)
**DELEEUW LAW LLC**
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
brad@deleeuwlaw.com

*Counsel for Plaintiffs*

OF COUNSEL:
Mark S. Reich*
Christopher V. DeVivo*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mpollack@zlk.com

**pro hac vice* forthcoming